# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JOSH HENRICK, et al., ) | |
| ) | |
| Plaintiffs/Counter-Defendants, ) | |
| ) | |
| v. ) | NO. 3:18-cv-00621 |
| ) | |
| TRINITY MEALOR, et al., ) | JUDGE CAMPBELL |
| ) | MAGISTRATE JUDGE FRENSLEY |
| Defendants/Counter-Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| ERIN HENRICK, ) | |
| ) | |
| Third Party Defendant. ) | |

## MEMORANDUM

### I. Introduction

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 120), Defendants' Response (Doc. No. 129), and Plaintiffs' Reply (Doc. No. 132). For the reasons set forth herein, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 120) is **DENIED**.

### II. Factual and Procedural Background

The claims in this case arise out of the formation and operation of Tennessee Hemp Supply, LLC. ("THS") (Doc. No. 88). Plaintiffs Josh Henrick and Jason Chambers contend they are owners of the business, and Defendants Trinity Mealor and Brandon Harris make the same claim. (Plaintiffs' Responses to Defendants' Statement of Additional Disputed Material Facts for Trial (Doc. No. 137 ¶ 1)). Plaintiffs assert claims for conversion, breach of fiduciary duty, fraud and misrepresentation, unjust enrichment, conspiracy, violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.*, trademark infringement and violations of

the Lanham Act, 15 U.S.C. §§ 1114, *et seq.*, false or fraudulent trademark registrations, unfair competition, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. (Doc. No. 88).

Through the pending motion, Plaintiffs seeks summary judgment on their claims for conversion, breach of fiduciary duty, and breach of contract. To support their motion, Plaintiffs have propounded 240 statements of "undisputed material facts," almost half of which are disputed by Defendants. (Doc. No. 130; Doc. No. 132, at 3). For their part, Defendants have propounded 15 "Additional Disputed Material Facts for Trial." (Doc. No. 137). The basic positions of the parties, however, are reflected in prior sworn testimony from Plaintiff Henrick and Defendant Mealor summarized below.

Plaintiff Henrick testified at his deposition that, in November 2017, he bought a farm to grow hemp after learning about the idea from Plaintiff Chambers, who ran a hydroponics store and held a hemp-growing license. (Doc. No. 62-3, at [deposition pages] 6-13). According to Mr. Henrick, he shared his plans to purchase and operate the farm with Defendant Mealor, a friend he first met in college. (*Id.,* at 6, 14). Mr. Mealor came up to the farm from Georgia periodically to assist in building greenhouses and helping with the harvest. (*Id.,* at 14-16). In March 2018, Mr. Henrick started A Smiling Child, LLC ("ASC") to own and run the farm. (*Id.,* at 10-11, 15-16).

The plans for the hemp product grown on the farm evolved rapidly, according to Mr. Henrick, from plans to sell it as industrial hemp to plans to sell it wholesale to retailers, and finally, to selling it directly through retail establishments. (*Id.,* at 17). Mr. Henrick discussed those plans with various individuals, including Mr. Mealor. (*Id.,* at 18-20). According to Mr. Henrick, "we made the decision as a team to open a store. And I say 'we' because it was going to take more than me to do it, meaning that I had a current landscape architecture practice. I was active. I never

2

stopped doing it. I started the farm that was an hour away from my house. I spent a whole year getting that ready, and so I needed help . . ." (*Id.,* at 21).

Mr. Henrick said Mr. Mealor "did a lot of the groundwork" in attempting to secure a physical space for the retail store, but Mr. Henrick ultimately decided to sublease space from Mr. Chambers in Murfreesboro, Tennessee. (*Id.,* at 28-29). According to Mr. Henrick, Mr. Mealor spoke with law enforcement authorities in Rutherford County to confirm that opening a hemp store there would be legal. (*Id.,* at 30). Although Plaintiffs argue in the pending motion that Mr. Chambers co-owned and operated the retail store, Mr. Henrick testified in his deposition that Mr. Chambers is not a co-owner of the business, but was instead a "W9 employee." (*Id.,* at 56-57, 68-69).[1]

Beginning the first of June 2018, Mr. Mealor, Mr. Harris, and others spent approximately two weeks working on the store "build out," while Mr. Henrick was primarily working at his farm and on vacation in Colorado. (*Id.,* at 31-33, 35). The store opened on June 14, 2018, with Mr. Mealor on the premises. (*Id.,* at 33, 35-36). Mr. Henrick acknowledged he did not obtain the tax identification number or the business license for THS, nor did he register the business as a limited liability company with the state regulatory authority. (*Id.,* at 66-67).[2] At the time, Mr. Henrick was working 80 hours a week, and was "neglectful" and "detached" with regard to those tasks. (*Id.*)

---

[1] Mr. Henrick testified he subsequently formed Middle Tennessee Hemp Company, and that Mr. Chambers *is* a co-owner of that business. (*Id.,* at 75). Mr. Henrick and Mr. Chambers apparently have had their own business disputes, which they have attempted to resolve through mediation. (*Id.,* at 51-55).

[2] The Articles of Organization for THS indicates it has two members, but does not identify them. (Doc. No. 14-1). Mr. Mealor's name is listed as the person who submitted the form. (*Id.*).

According to Mr. Henrick, he never contemplated that Mr. Mealor would be a co-owner of THS. (*Id.,* at 73-74). Instead, Mr. Henrick testified, Mr. Mealor would receive profit-sharing as compensation for his work. (*Id.,* at 74). Mr. Henrick testified that he and Mr. Mealor initially spoke about a 60/40 split:

> I said, 'Man, that would be great.' If I can run the farm and we still make 60? They make 40 and they run the farm (sic). But, you know, when we got to game time I thought, because of consideration of the matter, how much debt that I have, you know understanding what capital contributions are, that I decided that 40 percent was too much to start and that it could graduate from there from 20, and that makes more sense.

(*Id.,* at 59).

Mr. Henrick recalled two specific occasions on which he and Mr. Mealor discussed how Mr. Mealor was to be paid. (*Id.,* at 39-41). One occurred at his farm in May 2018. (*Id.*). At that time, Mr. Henrick "talked about a net profit share at 20 percent, maturing to 40 percent or more, depending on how successful it was. And that's what I maintained for the sake of conversation." (*Id.,* at 40). The second conversation occurred on June 22, 2018, at about 2:30 a.m., at Mr. Henrick's kitchen table, where Mr. Henrick discussed with Mr. Mealor and Mr. Harris "how the business model would work." (*Id.,* at 41-42). The parties discussed a beginning split of net profit of 80 % to ASC (Mr. Henrick) and 20% to THS (Mr. Mealor). (*Id.,* at 42-43). The reason for that split, according to Mr. Henrick, was because: "there was no contributions made by Trinity [Mr. Mealor]. I invited him to come. I could have paid him a salary, but he did not want a salary. He wanted a percentage. This worked out best for us because he wanted it and I wanted this as an incentive to perform." (*Id.,* at 43). Over time, Mr. Henrick testified, Mr. Mealor's share would increase to give him more equity in the business, as Mr. Henrick's debt was paid off. (*Id.,* at 44).

4

The particulars of an agreement were never reduced to writing,[3] however, because Mr. Henrick's proposal "was not well received" by Mr. Mealor. (*Id.,* at 45-46). Mr. Mealor "left my house at 4:30 in the morning to go to the store instead of going to bed, because I think he was upset." (*Id.,* at 46). A short time later, on June 24, 2018, Mr. Henrick "fired" Mr. Mealor via text. (*Id.,* at 47-48).

Mr. Henrick testified that he and Mr. Mealor never agreed on terms:

Q. So from your perspective did you all ever reach an agreement on how monies were to be split?

A. I don't think we ever did because, like I said, the morning of the 23rd, 22nd, Friday the 22nd when we went over this, I felt like it wasn't well received. I think that – I don't – I don't think it was – and this is as far as we got in memorializing anything. There was nothing ever constructed with an attorney or an accountant or – this was as much construction as we ever got.

(*Id.,* at 60). Because the proposal "fell apart," it was never reduced to writing. (*Id.,* at 74).

Mr. Mealor has a different view of the parties' arrangement. Mr. Mealor testified that he was the owner of THS, and intended to operate it as a retail store. (Doc. No. 110, at 65, 68). According to Mr. Mealor, THS had a consignment agreement with Mr. Henrick to sell the hemp grown on Mr. Henrick's farm. (*Id.*) Although the parties discussed different percentages during their discussion on June 22, 2018, they did not reach an agreement as to how the proceeds from the sale of Mr. Henrick's hemp and other products would be split. (*Id.,* at 65-66; 68-70; 87).

### III. <u>Analysis</u>

#### A. <u>The Standards Governing Motions for Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[3] Mr. Henrick testified that the paper on which he wrote the numbers discussed on June 22, 2018, was not intended by him to be a legally binding agreement. (*Id.,* at 71).

56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio*, 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### B. **Breach of Fiduciary Duty**

In order to recover for breach of fiduciary duty under Tennessee law, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of the breach.[4] *In re Estate of Potter,* 2017 WL 4546788, at * 2 (Tenn. Ct. App. Oct. 11, 2017). As to the first element, "Tennessee law recognizes

---

[4] Plaintiffs seeks summary judgment as to liability only, and suggest a hearing would be appropriate to determine damages.

two types of fiduciary relationships: relationships that are fiduciary *per se* (*e.g.*, attorney/client, guardian/ward) and relationships that are 'confidential' due to one party's ability to exercise 'dominion and control' over another party." *Innerimages, Inc. v. Newman,* 579 S.W. 3d 29, 49 (Tenn. Ct. App. 2019). Plaintiffs appear argue the parties' relationship made them fiduciaries *per se*.

Plaintiffs argue at length that they are the true owners of THS, and they employed Defendants to help open and operate THS because Defendants had sales experience. Plaintiffs contend that, as employers/employees, the parties were in a fiduciary relationship, and Defendants breached their fiduciary duties by funneling THS revenues into their own accounts.

Defendants argue they were not employees of Plaintiffs, but were consignees of Plaintiffs' hemp product, and as consignees, Defendants created THS to operate their retail hemp store. Defendants contend the parties never reached an agreement as to the price to be paid for the consigned hemp, and before Defendants could perform calculations in that regard, Plaintiffs filed this lawsuit and sought to bar them from the THS premises. Defendants deny they owed or breached a fiduciary duty to Plaintiffs.

Plaintiffs argue resolution of the dispute between the parties as to their legal relationship and the ownership of THS "is simply a matter of the Court applying the law to the facts." (Doc. No. 132, at 2). In this case, however, the "facts" are clearly in dispute, and the legal conclusions urged by Plaintiffs requires the Court to accept their view of the disputed facts. For example, Plaintiffs contend "Defendants agreed, as a term of their employment, to open and operate Tennessee Hemp Supply in return for a future share of net profits." (Doc. No. 121, at 19). The testimony described above, however, creates a genuine issue of disputed fact as whether the parties ever came to any "agreement" about their relationship. Plaintiffs point out several reasons for

questioning the credibility of Defendants, but a court may not make credibility determinations or weigh the evidence in order to grant summary judgment. Thus, Plaintiffs have not established they are entitled to summary judgment on their "employers/employees" breach of fiduciary duty claim.

Plaintiffs alternatively argue that, even if the Court determines Defendants and Plaintiffs were co-owners/members of THS, rather than employers/employees, Defendants still owed them "a fiduciary duty of loyalty, a duty to refrain from competing with the LLC, and to account for any property, profit and benefit [] derived from the LLC." (Doc. No. 121, at 24-25). As set forth above, however, Mr. Henrick rejects the notion that Mr. Mealor was ever a co-owner of THS, and Mr. Mealor rejects the notion that Mr. Henrick was a co-owner of THS. Thus, Plaintiffs seek to have the Court base summary judgment on an assumption of facts rejected by the sworn testimony of both principal parties. Plaintiffs have not cited authority permitting the Court to do so. Thus, Plaintiffs have not established they are entitled to summary judgment on their "co-owners" breach of fiduciary duty claim.

Finally, Plaintiffs argue that, even if Defendants owned THS and were in a consignment relationship with Plaintiffs, they owed Plaintiffs a fiduciary duty as consignors/consignees. Plaintiffs cite three cases to support this theory, but none of them establish that a consignment relationship creates fiduciary duties under Tennessee law. *See The Judds v. Pritchard,* 1997 WL 589070 (Tenn. Ct. App. Sept. 24, 1997) (discussing fiduciary duties owed by booking agent/promotor to client); *SKS Communications, Inc. v. Globe Communications, Inc.,* 1994 WL 589576 (Tenn. Ct. App. Oct. 21, 1994) (holding that agent/employee owes fiduciary-type duties to principal/employer); *Parker v. Wilcher,* 1994 WL 240331 (Tenn. Ct. App. June 3, 1994) (affirming trial court's conclusion that plaintiff was a good faith purchaser of car purchased from consignee; no discussion of fiduciary duties owed by consignee to consignor). Thus, Plaintiffs

8

have not established they are entitled to summary judgment on their "consignment" breach of fiduciary duty claim.

**C. <u>Conversion</u>**

Tennessee courts define "conversion" as the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.,* 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012). In order to plead a prima facie claim of conversion, a plaintiff must show: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Id.*

Money is generally considered intangible property and not subject to a claim for conversion. *Id.* "However, there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose." *Id.* Conversion may be established for these identifiable funds "where a party shows ownership or the right to possess specific, identifiable money." *Id.* For example, "tax receipts or insurance premiums, where there is an obligation to keep the money intact or to deliver it," may be the subject of a conversion claim. *Id.* Also, "where the defendant is under an obligation to deliver specific money to the plaintiff and fails or refuses to do so, or when wrongful possession of it has been obtained by the defendant," there is conversion. *Id.*

On the other hand, there is no conversion of money "unless there was an obligation on the part of the defendant to deliver specific money to the plaintiff or unless the money was wrongfully received by the defendant." *Id.* Conversion "does not lie to enforce a mere obligation to pay money or for money had and received for payment of a debt." *Id.* To establish conversion, a plaintiff must show "a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's

9

property, or a wrongful detention or interference with another's property." *Id.*, at 554. A plaintiff "must allege and prove facts showing a right to immediate possession of the property at the time of conversion," and the defendant's actions with respect to the allegedly converted property "amount to a repudiation of the plaintiff's title or an exercise of dominion over the property." *Id.*

In ordering preliminary injunctive relief in this case, the Court concluded that Plaintiffs had shown a likelihood of success on the merits on their conversion claim because Defendants admitted they had not paid Plaintiffs for their hemp products, and that "Defendants are likely to dissipate the proceeds from the sale of the product such that funds will no longer exist to compensate Plaintiffs should Plaintiffs succeed in establishing their claims at trial." (Doc. No. 65, at 3-4). In reaching its decision, the Court explained that, even though the ownership of THS was in dispute, injunctive relief could be awarded without resolving that dispute. (*Id.*)

The standard for awarding summary judgment, however, is different than that required for a preliminary injunction. In order to obtain summary judgment, Plaintiffs must show there is *no* genuine material factual dispute regarding the facts surrounding the alleged conversion, including the true relationship between the parties, and the intended division of proceeds. Plaintiffs have not conceded the parties had a consignment relationship, but rather continue to insist Defendants were their employees. Resolution of that and other factual disputes must be made by a jury before judgment can be entered on the conversion claim. Thus, Plaintiffs have not established they are entitled to summary judgment on the claim.

### D. **Breach of Contract**

Under Tennessee law, a party may enforce an oral contract if the party demonstrates: (1) the parties mutually assented to the terms of the contract, and (2) these terms are sufficiently definite to be enforceable. *Burton v. Warren Farmers Co-op.,* 129 S.W.3d 513, 521 (Tenn. Ct.

App. 2002). The mutual assent "need not be manifested in writing," and may be manifested "in whole or in part, by the parties' spoken words or by their actions or inactions." *Id.* The mutual assent "should not, however, be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the contract may be drawn." *Id.* Additionally, mutual assent "may not rest solely on the uncommunicated intentions or states of mind of the contracting parties." *Id.*

Plaintiffs argue that "if the Court finds that Defendants, in fact, own Tennessee Hemp Supply, then the facts of this case establish that a contract was entered into between Defendants and Plaintiffs Henrick and Chambers." (Doc. No. 121, at 30). According to Plaintiffs, the terms of the contract required the parties to split the net profits 80/20, with 80% going to Plaintiffs and 20% going to Defendants.

As discussed above, however, there are genuine issues of material fact precluding summary judgment on this claim, particularly as to the question of whether the parties mutually assented to definite terms. Indeed, even Plaintiff Henrick testified that the parties never reached an agreement on how the revenue was to be split. As explained above, Plaintiffs present lengthy arguments supporting their view of the facts, but those arguments are more appropriately directed to a jury. Thus, Plaintiffs have not established they are entitled to summary judgment on their breach of contract claim.

## IV. Conclusion

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 120) is denied.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE